Stuart S. KENNEDY, Appellant,

v.

STATE of Indiana, Appellee.

No. 16S00–8808–CR–785.

Supreme Court of Indiana.

Sept. 19, 1991.

J. Richard Kiefer, Kevin P. McGoff, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

KRAHULIK, Justice.

Defendant–Appellant, Stuart S. Kennedy, was convicted by a jury of the crimes of murder, felony murder, kidnapping, a class A felony, and robbery, a class C felony. Pursuant to IND.CODE § 35–50–2–9, the jury was reconvened for the sentencing hearing and it, ultimately, recommended against the death penalty. The trial court, nevertheless sentenced Kennedy to death.

In this direct appeal, Kennedy raises ten issues, as follows:

1. Whether the trial court committed reversible error by overriding the jury's recommendation against the death penalty.
2. Whether the trial court erred by failing to consider mitigating evidence presented by the defendant, and by disregarding the statute and ordering the death penalty.
3. Whether the trial court erred by admitting into evidence items obtained by a warrantless search of a gym bag loaned to and used by Kennedy.
4. Whether the trial court erred by admitting items of physical evidence without a sufficient chain of custody.
5. Whether the trial court erred in denying Kennedy funds to employ an expert witness.
6. Whether the trial court erred in denying Kennedy's motion to dismiss.
7. Whether the trial court erred in admitting gruesome photographs of the victim.
8. Whether the trial court erred in failing to set aside the jury's verdict because the jury conducted an improper experiment with the evidence.
9. Whether the trial court erred by allowing testimony of a State witness not listed in the State's responses to Kennedy's discovery requests.
10. Whether the trial court erred in admitting a certified copy of Kennedy's driver's license.

We affirm Kennedy's convictions but reverse the trial court's sentencing of Kennedy to death.

The facts, viewed in the light most favorable to the jury's verdict, follow. On October 9, 1986, Michelle Seagraves was kidnapped from the parking lot in front of her apartment in Columbus, Ohio. The kidnapper forced her into her car and drove away with her. Two schoolchildren, awaiting a schoolbus, saw a car matching the description of Seagraves' car being driven by a man who pushed a woman's head down and held it down with his leg as he drove. These children identified Kennedy as the man they saw that morning. Later that day, a bank in Moores Hill, Dearborn County, Indiana, was robbed of over $88,000 by two masked gunmen who fled the scene in a car matching the description of the Seagraves car. One of the gunmen was described as being about six feet three inches tall and the second was reported to be about five feet seven inches tall. Judy Volz, a resident of Moores Hill, had noticed before the robbery that a white Corvette had been parked along a county road. Being suspicious, she wrote down its license number. After the robbery, Eric Ester, another area resident, reported to police that he saw a white Corvette speeding from Moores Hill. Following these leads, police found Seagraves' car parked along the county road where Ms. Volz had seen the Corvette earlier in the day.

Indiana State Police notified the Columbus, Ohio, police department of the bank robbery and the discovery of the Seagraves car. They learned in that conversation that Seagraves had apparently been abducted. A check with the Ohio bureau of motor vehicles showed that the white Corvette was registered to Donald Jackson of Columbus, Ohio. Columbus police knew Jackson as a convicted bank robber and dispatched officers to his residence to stake it out. On the morning of October 10, 1986, Jackson was arrested as he was putting things into his Corvette.

A search of Jackson's Corvette resulted in the seizure of weapons, currency, and various other objects. Jackson was taken

to the Columbus police department where he was questioned and, afterwards, accompanied the police to a trash dump adjacent to the residence of Stuart Kennedy near Cincinnati, Ohio. There police found all but $5,000 of the remaining bank robbery proceeds.

After police met with Donald Jackson, they searched dumpsters in Dayton, Ohio, and found a trash bag containing various articles of clothing, gloves and other items, including a size 11–½ running shoe whose tread, in later analysis, was found to match a tread imprint on the counter of the bank where the taller robber had leapt over the counter during the robbery.

Additionally, Jackson drew a map of the Moores Hill area and pointed out where the body of Michelle Seagraves could be found. After a search of the area near Moores Hill, Michelle Seagraves' body was found. She had been bound, strangled, beaten in the head, and shot by a .41 caliber bullet in the back of her head.

While police officials were conducting their investigation in Moores Hill, FBI agents went to Stuart Kennedy's place of employment and arrested him. Agents also questioned Kennedy's fellow employee and girlfriend, Cynthia Gianetti, and learned that Kennedy had spent the previous night at her apartment. Gianetti also told the agents that Kennedy had come to her apartment with a gym bag earlier in the evening of October 9th, and that, although she allowed Kennedy to use it, the gym bag belonged to her. The agents obtained a voluntary consent from Gianetti to "search my premises and my gym bag." Acting upon this consent, the agents, accompanied by Gianetti, went to her apartment and searched the gym bag without obtaining a search warrant. Among other items in the gym bag, agents found what the State claimed was the murder weapon, a Smith & Wesson .41 caliber revolver, a box of 50 .41 caliber bullets, 49 of which were either in the box, in the revolver, or loose within the gym bag, and a new pair of size 11–½ running shoes.

Additional evidence adduced at trial showed that Kennedy and Jackson had spent the entire day of October 9, 1986, together. They were identified by Eric Ester as being the two men that he had seen in the Moores Hill area prior to the bank robbery. Additionally, Kennedy's sister testified that she saw Kennedy and Jackson in the afternoon of October 9th at Kennedy's residence, where she also resided, and that Kennedy was calm and cool while Jackson was very aggitated. They gave her some money to go buy some beer, causing her to be gone from the house for approximately 20 minutes. Shortly after her return, Kennedy and Jackson left, apparently to return to Jackson's home in Columbus, where they parted, with Kennedy apparently going to Gianetti's home near Cincinnati. Additional facts will be stated as necessary.

### I & II. *The Judge's Overriding of the Jury's Recommendation Against the Death Penalty*

After finding Kennedy guilty of murder, felony murder, kidnapping and robbery, the jury reconvened for the penalty phase of the trial pursuant to Ind.Code § 35–50–2–9. During the penalty phase, the jury was allowed to consider all of the evidence which it had previously heard during the guilt phase and, in addition, heard from 30 witnesses called to testify in the penalty phase. Following the evidence, the jury deliberated and recommended against the death penalty for Kennedy. Following a pre-sentence investigation, the trial court, at the sentencing hearing, thoughtfully and articulately set forth what he determined to be the aggravating and mitigating circumstances found by him from the evidence and, in view of those findings, overrode the jury's recommendation and sentenced Kennedy to death.

We note that the sentencing occurred in March 1987, two years before our opinion of *Martinez Chavez v. State* (1989), Ind., 534 N.E.2d 731, *reh'g denied*, 539 N.E.2d 4. In *Martinez Chavez*, this Court set forth the standard governing a trial court's decision to impose the death penalty following a jury's recommendation against a death sentence:

A trial judge can proceed to impose a penalty of death only when the charging aggravating circumstances have been proven beyond a reasonable doubt and when all the facts available to the court point so clearly to the imposition of the death penalty that the jury's recommendation is unreasonable.

539 N.E.2d at 5. In other words, after any jury recommendation pursuant to the death penalty statute, the trial court as trier of fact must independently determine the existence of aggravators and mitigators, weigh them, consider the recommendation of the jury, and come to a separate conclusion as to whether or not to impose the death penalty. However, when the jury's recommendation is against the penalty of death, it is to be given a special—but not controlling—role in the judge's process, because it represents factual and evaluative determinations with respect to aggravators and mitigators in favor of the defendant following a fair hearing, and because it represents the collective conscience of the community. In such cases, after determining the aggravators and mitigators and assigning each its just weight, and after assigning the recommendation of the jury its considerable weight, the trial court must then determine whether the relative weight of the proven aggravator or aggravators points so clearly to the imposition of the death penalty that the jury's recommendation must be superseded. Nonetheless, and despite the heightened role of the jury recommendation of life, ultimately it is the judge who must make the final sentencing decision.

Because the trial court did not have this standard available to it when Kennedy was sentenced to death, we must reverse and remand to the trial court to re-sentence Kennedy with this standard in mind.

### III. *Admissibility of the Evidence Obtained From the Search of the Gym Bag*

█ Both at the hearing on the motion to suppress as well as at the trial itself, Kennedy urged that the warrantless search of the gym bag found in Gianetti's apartment should result in the suppression of the evidence obtained.

Gianetti testified that in July or August, she lent Kennedy a gym bag in which to carry various personal articles of his when he came to see her. When he came to her house, he would normally bring the bag with him. Kennedy used it exclusively. Gianetti could not recall any time she ever got into the bag. If she had wanted the bag back, she would have probably let Kennedy use it until he didn't need it, and then he would give it back to her. She would not have reclaimed the bag without first giving Kennedy the opportunity to remove his possessions from it.

On October 9, 1986, when Kennedy arrived at her apartment, he brought the gym bag with him and put it on the dining room table where it remained when they left for work the following day. Other than a scarf that was draped on top of the bag, no other item belonging to Kennedy was visible. On October 10, when Gianetti spoke with FBI agents during their investigation, she told the agents that the bag belonged to her, that she had lent it to Kennedy, and had not used the bag thereafter. The agent acknowledged that he did not ask Gianetti whether she had used the gym bag after loaning it to Kennedy. He did not ask her if she had reached inside the gym bag since that time. When the agents asked Gianetti for permission to search the bag, she was told that, if she did not consent, they would obtain a search warrant. She signed a consent form permitting the search.

After obtaining the consent, the agents went to Gianetti's apartment, and went directly to the bag, lifted it, opened it, and searched its contents. Among the items found in the bag were a .41 caliber Smith & Wesson revolver, believed to be the murder weapon, a speed loader, and 49 bullets claimed to have come from the box of 50, leaving one missing which was claimed by the State to be the bullet that killed Seagraves.

Kennedy testified at the suppression hearing. He indicated that from the time that Gianetti gave him the bag, it was

treated as his property and that he could not recall any time that she had ever reached inside it. He acknowledged that the bag had been loaned, not given, to him. When he left the house on the morning of October 10, his intention was to return to her house that evening and leave with the bag and his personal property contained in it.

The trial court initially granted Kennedy's motion to supress the evidence obtained from the search. However, the issue was resurrected by the State. The trial court reversed its decision, and allowed the State to introduce evidence obtained during the search.

Kennedy argues that this was an invalid search under *United States v. Matlock* (1974), 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (a third party must have common control over the premises to give valid consent to a warrantless search). We need not decide today whether, under *Matlock* and its progeny, this search would have been valid. Even if Gianetti lacked authority to consent to a search of the gym bag, a warrantless search is legal if the agents "reasonably believe" that she had such authority. *Illinois v. Rodriguez* (1990), — U.S. —, 110 S.Ct. 2793, 111 L.Ed.2d 148.

In *Rodriguez*, the issue was whether a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not. *Id.* at —, 110 S.Ct. at 2796, 111 L.Ed.2d at 155. Police had obtained permission for a warrantless search of the defendant's apartment from the defendant's former girlfriend. The ex-girlfriend had once lived with the defendant in the apartment, but was not at the time she consented to the search, and, therefore, did not have actual authority to give consent to search. The Court concluded, however, that if the facts available to the investigating officer at the time would "warrant a man of reasonable caution in the belief that the consenting party had authority over the premises," the search would not be unreasonable, and accordingly, not invalid. *Id.* at —, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. The case was remanded to the Illinois courts for a determination of whether the officers reasonably believed that the ex-girlfriend had the authority to consent to a search.

Here, we conclude that the agents had a reasonable belief that Gianetti had the authority to consent to the search of the bag. The agents knew that the bag belonged to Gianetti, and that she expected the bag to be returned to her. Legally, she could reclaim the bag at any time. She could have, had she chosen to, emptied the bag of its contents and placed them on her dining room table for the agents to see. Under the reasoning in *Rodriguez*, Gianetti's consent was sufficient to provide the agents with the authority to search the bag without a warrant.

### IV. *Chain of Custody*

█ Kennedy next urges, on the grounds of an inadequate chain of custody, that the trial court erred in admitting expert testimony of FBI agents Deedrick and Corby and articles consisting of human hair, fibers from a carpet and certain microsopic particles about which they testified. Kennedy claims that because the FBI technician who prepared the evidence for scientific examination (by mounting some of the material on slides and placing other material in containers) did not testify, a fatal gap in the chain of custody existed.

The testimony of Deedrick and Corby tended to establish that the hairs found on the shirt retrieved from the dumpster in Ohio were Kennedy's, that a fiber found on the shirt was from the Seagraves automobile, that the hair found on a floor mat in the Seagraves automobile was Kennedy's, and that debris taken from the hat and some hosiery contained particles from the gloves found in the dumpster with the shirt. The evidence in question was gathered from the scene and mailed to the FBI laboratory for analysis. An FBI lab technician who prepared the evidence on slides for examination by Deedrick and Corby was not called as a witness to testify about the chain of custody. Instead, Deedrick testified that, although he did not stand next to the technician while the evidence

was prepared, the technician worked under Deedrick's control and supervision, and that the use of technicians in this way had been standard procedure at the FBI for forty years. Kennedy challenges the chain of custody only within the FBI laboratory; he does not dispute that the State presented sufficient chain of custody evidence to establish transfer of the evidence from the place it was gathered to the FBI laboratory.

 In Indiana, the party offering the evidence need only provide "reasonable assurance" that the evidence passed through various hands in an undisturbed condition, and need only provide evidence that "strongly suggests" the exact whereabouts of the evidence at all times. *Russell v. State* (1986), Ind., 489 N.E.2d 955, 957. Defendant must then present evidence which must do more "than raise the mere possibility that the evidence could have been tampered with or that a substitution or alteration could have been made." *Gambill v. State* (1985), Ind., 479 N.E.2d 523, 529. Thus, the State need not establish a perfect chain of custody, and any gaps go to the weight of the evidence and not its admissibility. In addition, there is a presumption of regularity in the handling of exhibits by public officers, and a presumption that public officers discharge their duties with due care. *See, United States v. Lott* (1988), 7th Cir., 854 F.2d 244; *United States v. Aviles* (1980), 7th Cir., 623 F.2d 1192. Here, we conclude that the State sufficiently established that customary procedures were followed by the FBI. We are satisfied that there is the required reasonable assurance that the property moved through the hands of the FBI agents in an undisturbed condition, and that the evidence strongly suggests the exact whereabouts of the evidence during the time it was in the possession of the FBI. Accordingly, we find no error in the admission of this evidence.

## V. *Funds to Employ Expert Witness*

Kennedy next assigns error to the trial court's ruling denying him funds to employ an expert witness in the field of memory and perception. Kennedy made two motions to the trial court. In the first, he requested funds to employ Elizabeth Loftus, Ph.D., who Kennedy claimed was a recognized expert in the field of memory and perception as it relates to eyewitness identifications. Later, Kennedy made a similar motion requesting funds to retain Robert Buckout, Ph.D., who would testify on the same issue. Both motions were denied. Kennedy claims the denial of his motions constitutes error because he was unable to prepare an adequate defense and, as a result, was deprived of a fair trial.

In *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53, the Supreme Court concluded that a defendant is entitled to retain a psychiatrist as an expert witness at public expense when the defendant pleads insanity and is without the funds to employ an expert on the issue of sanity. The Court concluded that because the issue of sanity was likely to be a significant factor at the trial, and, that without his own expert on the subject, Ake would be denied "meaningful access to justice," he was entitled to the funds needed to retain the expert. Kennedy asks us to conclude that the reasoning in *Ake* applies to his situation.

 In Indiana, a criminal defendant is not constitutionally entitled, at public expense, to any type or number of expert he desires to support his case. *Pittman v. State* (1988), Ind., 528 N.E.2d 67, 71–2. A judge may authorize or appoint experts where necessary. *Owen v. State* (1979), 272 Ind. 122, 396 N.E.2d 376. The appointment of experts is left to the sound discretion of the trial court, *Lowery v. State* (1985), Ind., 478 N.E.2d 1214, 1220, *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1985), and only an abuse of that discretion will result in a reversal. *Hough v. State* (1990), Ind. 524 N.E.2d 1287, 1288. The defendant who requests that the court appoint an expert witness has the burden of demonstrating the need for the appointment. *Burgans v. State*, (1986), Ind., 500 N.E.2d 183, 186. A court must provide a defendant access to experts where it is clear that prejudice will other-

wise result. *Palmer v. State* (1985), Ind., 486 N.E.2d 477, 481.

■ Although Indiana courts have examined *Ake*, we find no case which has addressed the question of whether the denial of funds for an expert witness in the field of memory and perception is reversible error.

Kennedy claims that Dr. Loftus was needed to assist his attorneys in two areas critical to his defense. First, the assistance was needed to aid his attorney's cross examination of the eyewitnesses expected to testify for the State. Kennedy claims that effective cross examination of the eyewitness was critical to his case because the State based its attempt to link Kennedy to the crime through the seven eyewitnesses. Secondly, the defense intended to call Dr. Loftus to explain to the jury the conclusions she has reached in her studies relating to the reliability, memory and perception (or lack thereof) of eyewitnesses in general.

Kennedy made no showing that his counsel was unable to prepare adequate cross examination of the eyewitnesses by studying the expert's published writings, or that counsel did not already possess the skills to adequately cross examine a witness about the witness's ability to observe and recall events. In addition, the fact that a witness may not recall experiences with perfect clarity or may have had a less than perfect opportunity to observe a person or event is not usually something beyond the ability of a juror to understand or beyond the ability of an attorney to demonstrate in cross-examination and oral argument.

We agree with Kennedy that the appointment of experts from diverse specialities may, depending on the nature of a given case, be required to give a defendant a fair trial. We do not, however, agree that he was denied the meaningful access to justice to which he was entitled under *Ake* or that his right to present a defense was effectively foreclosed. The trial court was within its discretion to deny Kennedy's motions for funds to retain experts.

## VI. *Motion to Dismiss*

Prior to trial, Kennedy filed a motion to dismiss on the grounds that the Indiana Death Penalty Statute was unconstitutional. Because of our resolution on Issues I and II, we do not address this argument.

## VII. *Admission of Photographs*

■ Kennedy next argues that he was denied a fair trial because certain gruesome photographs were admitted at trial. Kennedy concedes that the photographs, which depicted the extensive injuries to the victim, are admissible under current Indiana law. *See, e.g., Askew v. State* (1982), Ind., 439 N.E.2d 1350 (a photograph is admissible if it depicts a subject that the witness would be permitted to describe verbally) and *Webster v. State* (1981), Ind., 426 N.E.2d 1295 (this court reviews the decision of the trial court concerning admission of photographs only for an abuse of discretion). Instead, Kennedy urges us to abandon our current standard and adopt a new one. We decline Kennedy's invitation to adopt a different standard relating to the admission of photographs, and choose to leave those decisions to the sound discretion of the trial court. Here, the trial court could have concluded that the photographs helped the jury to understand the pathologist's testimony about the multiple injuries sustained by the victim and the cause of death. We do not find the photographs unduly prejudicial, and we find no abuse of discretion by the trial court in allowing the jury to view them.

## VIII. *Jury Experiment*

■ Kennedy claims the trial court committed reversible error in denying his motion to correct errors based on assertions that the jury conducted an improper experiment during deliberations. The State introduced two shirts found in a dumpster in Ohio. In contesting any link between himself and the shirts, Kennedy's counsel argued that neither shirt would even fit Kennedy. Two jurors, who apparently claimed to be of similar height and build to Kennedy, tried on the clothing and reported to the other jurors that the shirts fit them.

Kennedy argues that this case is similar to *In re Beverly Hills Fire Litigation* (1982), 6th Cir., 695 F.2d 207, where judgment for defendants in a class action lawsuit arising from the death of many people in a fire at the Beverly Hills Supper Club was reversed because of juror experiments. In *Beverly Hills*, plaintiffs contended that the fire was caused by "old technology" aluminum branch circuit wiring. Defendants contested this claim and argued that the fire was caused by other factors. During the trial, one of the jurors performed an experiment on his home wiring and reported his findings to the other jurors. The Court of Appeals reversed the denial of plaintiffs' motion for a mistrial based on this improper experiment. The court held that an experiment by the jury is improper where it amounts to additional evidence supplementary to that introduced during the trial.

Here, the jurors merely examined the evidence in question. In addition to touching and otherwise handling the shirt, two jurors put the shirt on their bodies. This trying on of the shirt did not constitute any extra-judicial experiment requiring reversal.

### IX. Witness Omitted From State's Discovery Responses

As his next assignment of error, Kennedy complains that a witness not included on the State's witness list was permitted to testify at trial. During the trial, the State moved to amend its witness list to include the manager of a Hermann's sporting goods store as a witness. Kennedy objected on the ground of surprise and prejudice. Kennedy's motion for a continuance was denied, but Kennedy's counsel spoke with Galloway for a short period of time before his testimony. Galloway was allowed to testify.

Kennedy complains that he was prejudiced by Galloway's testimony because counsel did not have adequate time to prepare for cross examination of a witness about whom he knew nothing until trial.

We conclude that counsel did an adequate job of cross examining Galloway and elicited information about how the items could have been purchased at other stores in the area. Upon this record, we are not convinced that Kennedy was prejudiced by the trial court's ruling.

### X. Admission of Driver's License

Finally, Kennedy asserts that the admission of a certified copy of his drivers license was error because his right to confront witnesses was violated. During trial, evidence was presented by Kennedy that his eyes were blue. One of the eyewitnesses described the taller bank robber, determined at trial to be Kennedy, as having green eyes. A certified copy of Kennedy's license which listed his eye color as green was admitted over his objection. The State did not produce at trial the official who had recorded the information about eye color on the license.

Kennedy argues that the license was hearsay because the official was not shown to be unavailable. Kennedy claims that, although the license was trustworthy as evidence that Kennedy had a valid Ohio driver's license on him at the time of his arrest, the item was not reliable hearsay as to the color of his eyes. He asserts that the failure of the State to show what procedures were used by the Ohio Bureau of Motor Vehicles in determining the color of an applicant's eyes rendered the item inadmissible hearsay and violated the standard established in *Ohio v. Roberts* (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (admission at trial of sworn testimony given at a preliminary hearing was allowed where the witness was unavailable and defendant had been given the opportunity during the hearing to cross examine the witness).

We do not agree with Kennedy that error was committed in the admission of the license. The license was properly admitted as a properly certified official record. *Barnett v. State* (1981), Ind., 429 N.E.2d 625, 628. The license contains information about Kennedy and was signed by him. Thus, it is admissible as a prior statement. *Hart v. State* (1978), 268 Ind. 358, 359, 375 N.E.2d 221, 222. Finally, we do not percieve any prejudice from the admission of the license. The State did not assert that

the license showed his eye color to be green. Each jury member had the opportunity to observe Kennedy's eye color during the course of trial and was able to make his or her own determination about the color of his eyes. Absent prejudice, we find no cause for reversal. *Brown v. State* (1983), Ind., 448 N.E.2d 10, 18.

Accordingly, we affirm the convictions, but reverse the sentence of death and remand to the trial court for a new sentencing determination in light of this opinion.

SHEPARD, C.J., and DICKSON, J., concur.

GIVAN, J., concurring and dissenting, with opinion.

DeBRULER, J., dissenting with opinion.

GIVAN, Justice, concurring and dissenting.

I respectfully dissent from the majority opinion's conclusion that this case should be remanded for resentencing. This is a companion case to the case of *Jackson, Jr. v. State of Indiana,* Cause No. 24S00–8811–CR–906.

The same situation concerning the death penalty prevailed in that case. The facts show that Jackson and Kennedy acted in concert from the inception of the kidnapping of the victim, the use of her automobile in the perpetration of a robbery, and her murder. Although the majority cites *Martinez Chavez v. State* (1989), Ind., 534 N.E.2d 731, *reh'g denied,* 539 N.E.2d 4, I do not see a parallel between the cases.

In this case, there is ample evidence to support a finding that Kennedy and Jackson planned to kidnap and to murder the victim. The facts in this case justify the imposition of the death penalty as set forth in Ind.Code § 35–50–2–9. I find nothing in this record to indicate the trial judge did not follow the proper procedure in sentencing appellant.

I concur with the majority opinion in the disposition of the other issues.

I would affirm the trial court.

DeBRULER, Justice, dissenting.

The federal agents who took the consent to search the khaki gym bag from Gianetti, knew that the bag belonged to Gianetti but that she had loaned it to appellant a few weeks before and that he was then in the process of using it to carry his personal belongings as he visited her in her apartment overnight, and that she expected him to return it to her when he no longer had use for it. The consent was given to the agents in the place where Gianetti worked, and at such time appellant was already in federal custody. There is little within these facts known to these agents which would move a person of reasonable caution to form the belief that Gianetti had authority to consent to a search of the bag at the time she gave that consent. *Illinois v. Rodriguez,* —— U.S. ——, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). A person of reasonable caution would instead conclude that at the time Gianetti's consent to search was given, she had control over the bag as part of the contents of her apartment, but that this control did not extend to the contents of the bag. If Gianetti had loaned a trunk to a friend, who had packed it and then returned it to her apartment pending their joint departure on a trip, Gianetti would not have had authority to consent to a search of that trunk by police. The friend would have had a privacy expectation in the contents of the trunk. Gianetti's ownership of such a trunk, and her temporary control of it pending their departure, would not in reason have given rise to the belief that she had authority to open the trunk and rummage through it, or to permit another to do so. That is precisely the situation here. Furthermore, there was no joint use of the bag by Gianetti and appellant, a factor found to be validating in *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). In sum, her consent to search the bag which she had loaned to appellant for his exclusive use was not valid, and the search of the bag without a warrant was therefore invalid. It was therefore error to have permitted the State to introduce the items seized from the bag into evidence. I would re-

verse and remand for a new trial at which the seized items are excluded.