**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MATTHEW J. MCGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| HUBERT COOK MAYHUGH III, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A01-1312-CR-531 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable David D. Kiely, Judge
Cause No. 82C01-1203-MR-335

**July 16, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Hubert Cook Mayhugh III appeals his convictions for felony murder, a felony, and theft, as a Class D felony, following a jury trial. Mayhugh presents five issues for our review, which we consolidate and restate as:

1. Whether the trial court abused its discretion when it admitted certain evidence.

2. Whether the State presented sufficient evidence to support his theft conviction.

3. Whether his sentence is inappropriate in light of his character.

We affirm in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY

In early 2012, Megan Mecum and Keith Vaughn were dating, but Mecum was not faithful to Vaughn. Mecum and Levi Mayhugh ("Levi"), Mayhugh's cousin, were romantically involved. And Mecum and Levi plotted to steal "everything" Vaughn had. Tr. at 377. Mecum and Levi told Mayhugh about their plan to rob Vaughn.

In February 2012, Mecum and Vaughn were married. The marriage was volatile, and Mecum repeatedly threatened to kill Vaughn. Vaughn ultimately obtained a protective order against Mecum. Mecum frequently stayed overnight with Levi and Mayhugh, who lived with Levi's parents in Evansville.

During the evening of March 10, Mayhugh, Mecum, and Levi were riding around Evansville in Mecum's GMC truck when they ran into Tony Martin, an acquaintance of Mayhugh's, at a gas station. Mayhugh explained to Martin that he was having financial problems. And Mayhugh told Martin that he, Mecum, and Levi "wanted to go rob"

2

Vaughn. Id. at 214. Mayhugh told Martin that, according to Mecum, Vaughn had $30,000 or $40,000 at his house. Martin tried to talk Mayhugh out of committing the robbery. Martin then watched Mayhugh, Mecum, and Levi drive off in the direction of Vaughn's neighborhood.

On March 11, Julie Moore and Kenneth Baker, whose backyard is catty-corner to Vaughn's backyard, found a bag they did not recognize sitting next to their trash cans. Inside the bag they found a DVR box, surveillance cameras, two cordless phones, and "a couple of bloody knives." Id. at 21. Moore called police, and Evansville Police Department Officers Anthony Hartweck and Tony Walker arrived to investigate. The officers determined that one of the phones found in the bag belonged to Vaughn, so they proceeded to Vaughn's house. They got no answer at the front door, but a neighbor gave them a key to gain entry. Once inside, officers found Vaughn's dead body in a bedroom. A cord was wrapped around Vaughn's neck, his throat had been cut, and there was blood spatter on the wall next to his body.

Officers obtained a search warrant for Vaughn's house. During their search, officers found: bloody shoe prints on the floor; two surveillance cameras that were similar to those found in the bag near Moore and Baker's trash; cut wires at the soffit of the northeast corner of the house matching the wires attached to the cameras found in the bag; a hat in the backyard; and cigarette butts. While officers were searching Vaughn's house, Mecum arrived in her GMC truck. Evansville Police Detective Stacy Spaulding spoke with Mecum, and Mecum "said some things that were kind of alarming[.]" Id. at 165. Accordingly, Detective Spaulding told Mecum that a police officer was going to

transport Mecum to the police station for further questioning. Mecum retrieved her purse from the back seat of the truck and became "visibly shaken" when she saw a wallet in the rear of the truck. Id. at 175. Mecum stated that the wallet had belonged to Vaughn, but officers discovered that the wallet belonged to Mayhugh. Officers found a receipt for Air Jordan tennis shoes in Mayhugh's wallet. Officers also discovered blood on a floor mat in Mecum's truck.

Officers contacted Mayhugh and, during an interview, he stated that Mecum and Levi had robbed and murdered Vaughn, but he denied any involvement. But Levi's mother, Rachel Mayhugh, told police that Mayhugh had admitted to her that he had stabbed Vaughn in the neck and killed him. And Mayhugh's friend Starr Fauquher told police that, the day after the murder, she had observed Mayhugh crying, and, when she asked him what was wrong, he said only that he "didn't mean to hurt him." Id. at 262. Mayhugh did not elaborate on what he meant by that statement.

Forensic tests revealed that the hat found in Vaughn's backyard contained Mayhugh's DNA. And the bloody shoe prints in Vaughn's house matched the tread pattern of an Air Jordan shoe found at Mayhugh's former residence. In addition, again, police had found a receipt for Air Jordan shoes in Mayhugh's wallet.

The State charged Mayhugh with felony murder, a felony; armed robbery, as a Class B felony; burglary, as a Class B felony; and theft, as a Class D felony. A jury found him guilty as charged. The trial court entered judgment of conviction for felony murder and theft and sentenced him as follows: sixty years for murder and thirty months for theft, to run concurrently. This appeal ensued.

4

## DISCUSSION AND DECISION

### Issue One:  Admission of Evidence

Our standard of review of a trial court's admission of evidence is an abuse of discretion.  Speybroeck v. State, 875 N.E.2d 813, 818 (Ind. Ct. App. 2007).  A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court or if the court misapplies the law.  See id.  Here, Mayhugh contends that the trial court abused its discretion when it admitted certain forensic evidence.  We address each contention in turn.

<u>Fungible Evidence</u>

Mayhugh maintains that the trial court abused its discretion when it admitted the State's exhibits numbered 26 through 34, 36 through 40, and 80.  Those exhibits included:  swabs from Mayhugh, Mecum, and Levi; Vaughn's blood; a hat alleged to contain Mayhugh's DNA; swabs from the bloody knives; a swab from the digital recorder; cigarette butts; and a report on the analysis of those items.  Mayhugh objected to the admission of each of those exhibits on the grounds that the State had failed to establish an adequate chain of custody in handling the evidence.  The trial court admitted each of the exhibits into evidence over Mayhugh's objections.

In <u>Culver v. State</u>, 727 N.E.2d 1062, 1067 (Ind. 2000), our supreme court explained:

> It is well established in Indiana that an exhibit is admissible if the evidence regarding its chain of custody strongly suggests the exact whereabouts of the evidence at all times.  <u>See</u> <u>Robinett v. State</u>, 563 N.E.2d 97, 100 (Ind. 1990); <u>Jones v. State</u>, 425 N.E.2d 128, 132 (Ind. 1981).  That is, in substantiating a chain of custody, the State must give reasonable assurances that the property passed through various hands in an undisturbed condition.

5

See Cliver v. State, 666 N.E.2d 59, 63 (Ind. 1996); Kennedy v. State, 578 N.E.2d 633, 639 (Ind. 1991), cert. denied, 503 U.S. 921 (1992). We have also held that the State need not establish a perfect chain of custody whereby any gaps go to the weight of the evidence and not to admissibility. See Wrinkles v. State, 690 N.E.2d 1156, 1160 (Ind. 1997) cert. denied, 525 U.S. 861 (1998); Kennedy, 578 N.E.2d at 639.

Here, Mayhugh points out that "a serologist in [an] Evansville laboratory prepared swabs from physical evidence and submitted those swabs through four evidence clerks and an unknown courier to the forensic biologist in [an] Indianapolis laboratory." Appellant's Br. At 12. But, Mayhugh asserts, the State did not present testimony from any of the evidence clerks or the courier. And he contends that "this gaping hole in the chain of custody is fatal" to the State's case. Id. We cannot agree.

Our supreme court addressed a similar argument in Cliver, where the defendant claimed that the State's failure to present testimony from a technician who had transported fungible evidence from Indianapolis to Evansville rendered the chain of custody inadequate. But our supreme court held that the totality of the evidence rendered the technician's testimony unnecessary. In particular, the court stated as follows:

> Two State Police crime scene technicians testified that they had gathered and sealed the contested evidence into bags, which they then marked with their initials. They arranged for the various samples to be transported to the Indianapolis State Police crime laboratory, and upon arrival the evidence was checked in by technician Connie Faust. Each technician also identified the evidence at trial, stating that it appeared to be in the same condition as when the samples were originally collected, except for the changes caused by testing. Because of a backlog at the Indianapolis laboratory, Faust eventually transported the evidence to the Evansville laboratory for analysis. The serologist from the Evansville office testified to the time of receipt of the samples and to the facts that the bags were still sealed and were delivered by Faust. The defendant urges that because Faust did not testify, there was a fatal gap in the foundation of the evidence. Over the defendant's objection, the trial court admitted the testimony related to the exhibits.

* * *

We find that the State sufficiently accounted for the whereabouts of the evidence. This Court presumes that public officials who handle evidence use due care and that the evidence is handled properly. Bell[ v State, 610 N.E.2d 229, 233 (Ind. 1993)]. Although Faust gave no testimony herself, the individuals who gave Faust the evidence and the serologist who received the evidence did testify. This testimony, along with that of the technicians who collected the samples, provides adequate assurance that the evidence passed through the various hands in an undisturbed condition. Therefore, absent a showing by the defendant that more than a mere possibility of tampering existed, the State's chain of custody must be deemed sufficient. The defendant has made no such showing and has therefore failed to rebut the presumption of proper handling.

Cliver, 666 N.E.2d at 63.

Here, likewise, the State presented sufficient evidence to substantiate the chain of custody with respect to the challenged exhibits. Evansville Police Department Officer Tony Walker testified that he personally collected each of the challenged exhibits and sealed them, after which the exhibits were "secured in the crime scene unit in a storage area until [they were] submitted to the Lab or placed in the property room of the Evansville Police Department." Tr. at 105-06. Nicole Hoffman, a forensic DNA analyst and serologist with the Indiana State Police Department Laboratory in Evansville ("the Evansville lab"), testified that when she received the exhibits, she marked each sealed packet with the case number, the name of the item, and her initials. Hoffman then performed serology tests on the items. Hoffman testified that items "that were going to be tested for DNA" were placed "in another envelope with our own markings, my initials, [and] case number" and sent by courier to the Indiana State Police Laboratory in Indianapolis ("the Indianapolis lab"). Id. at 250. The other items were repackaged, resealed, and placed in an evidence vault in Evansville.

7

Kimberly Masden, a forensic biologist at the Indianapolis lab, testified that, when evidence arrives at the lab, an evidence clerk stores the evidence in a secure vault until the case is assigned to an analyst, who then

> retrieves the evidence from the evidence clerk who retrieves it from the vaults and the analyst performs their [sic] analysis, they [sic] then return the evidence once their [sic] analysis is complete to the evidence clerk who stores it in the vault until the contributing agency comes to pick it up, the only difference from that is as far as DNA, sometimes sub items are created where samples are taken from a larger item, and we retain those at the laboratory[. T]hose aren't returned.

Id. at 400. Masden also testified that, "on all the items I examine, I place my mark for identification which includes the case number, my initials and employee number, along with the item number." Id. Finally, Masden identified, by name, four evidence clerks in the Evansville and Indianapolis labs who had handled the evidence in the context of checking it in and/or storing it. There was no evidence that any of the challenged exhibits had been tampered with during the process of collecting, analyzing, or storing the items.

Still, Mayhugh contends that the lack of evidence "regarding the transfer of fungible evidence across the State of Indiana to another facility—a transfer that involved at least five persons"—shows that "an entire link in the chain of possession is missing in this case[.]" Appellant's Br. at 16. Mayhugh avers that this court "should find that the potential for mistake, tampering, cross contamination and/or substitution is too great in this case." Id. at 13. In support of that contention, Mayhugh cites to Graham v. State, 253 Ind. 525, 255 N.E.2d 652 (1970), and Willis v. State, 528 N.E.2d 486 (Ind. Ct. App. 1988). But those cases are inapposite here. In Graham, the State had lost track of

8

fungible evidence for six days before conducting a "chemical examination" on it, and our supreme court held that that evidence should have been excluded at trial because of the "complete break in the chain of evidence." 255 N.E.2d at 655. And in Willis, the undisputed evidence showed that an unknown person tampered with the fungible evidence at issue. 528 N.E.2d at 489.

Here, we hold that the State presented ample evidence strongly suggesting the exact whereabouts of the evidence at all times and giving reasonable assurances that the property passed through various hands in an undisturbed condition. See Culver, 727 N.E.2d at 1067. Officer Martin testified regarding his procedures for collecting and packaging the evidence, and Hoffman and Masden testified regarding their procedures for conducting their analyses on the evidence, including resealing and labeling the evidence for storage and/or transport. This testimony provides adequate assurance that the evidence passed through the various hands in an undisturbed condition. Absent a showing by Mayhugh that more than a mere possibility of tampering existed, the State's chain of custody must be deemed sufficient. Mayhugh has made no such showing and has therefore failed to rebut the presumption of proper handling. See Cliver, 666 N.E.2d at 63.

Shoe Print Comparison Testimony

Mayhugh next contends that the trial court abused its discretion when it permitted testimony "regarding the similarity of a shoe print on a fence rail, photographed in State's Exhibit 53, to the shoe tread in another, comparable photograph." Appellant's Br. at 19.

9

In particular, Officer Walker testified regarding a photograph of a portion of a shoe print found on a fence rail in Vaughn's backyard and stated in relevant part as follows:

Q:    Okay, and that appears to be a footprint, a tread?

A:    It appears to be a pattern print of a shoe, yes.

Q:    Okay, do you know if it's similar to the one that was on the other picture?

A:    It has similar characteristics, yes.

\* \* \*

DEFENSE COUNSEL:   Preliminary question, Officer did you take that photograph?

A:    No I did not.

DEFENSE COUNSEL:   Did you observe that rail when the photograph was taken?

A:    Yes I did.

DEFENSE COUNSEL:  Did you . . . test it for prints that day?

A:    It was tested for prints that day.

DEFENSE COUNSEL:  But you did not do it?

A:    I did not do it.

Tr. at 139-40.  Mayhugh objected to the testimony as follows:  "I would object, Your Honor, he didn't take, he didn't examine this, only to take a photograph of it, I don't think he can testify as to what may or may not have been on that fence." Id. at 140.  And Mayhugh moved that the trial court strike the "testimony about the comparison" of the shoe prints, but the trial court denied that motion.  Id.

10

But, for the first time on appeal, Mayhugh contends that Officer Walker's testimony was inadmissible because it "failed to meet the standard set out by our supreme court in McNary[ v. State, 460 N.E.2d 145 (Ind. 1984)]." Appellant's Br. at 22. In McNary, our supreme court, quoting this court's opinion in Johnson v. State, 177 Ind. App. 501, 380 N.E.2d 566, 569 (1978), stated as follows:

> "Evidence of the character of footprints found where the crime is discovered and of the similarity of those footprints to the shoes worn by the defendant is admissible to identify him as the guilty person. . . . For the reason that footprints are large and the points of similarity are obvious (contrasted with fingerprints or palm prints), expert testimony is not required and the comparison may properly be made a subject of non-expert testimony. A witness is generally allowed to give his opinion as to their similarity, provided he bases his conclusion on measurements or peculiarities of the footprints."

(Emphasis in original.)

In support of his objection to Officer Walker's testimony at trial, Mayhugh argued that Officer Walker had only observed the shoe print on the fence rail, but had not "examine[d]" it himself. Tr. at 140. Mayhugh did not argue to the trial court that Officer Walker's testimony was inadmissible because he had not based his conclusion that the prints were similar on measurements or peculiarities of the prints. Nothing in McNary prohibits comparison testimony based on evidence prepared or processed by someone else. It is well settled that a defendant may not object on one ground at trial and raise another on appeal; any such claim is waived. See Houser v. State, 823 N.E.2d 693, 698 (Ind. 2005). Mayhugh has not preserved this issue for our review.

**Issue Two:  Sufficiency of the Evidence**

Mayhugh next contends that the State did not present sufficient evidence to support his convictions for armed robbery, burglary, or theft.  Because the trial court did not enter judgment of conviction on either the armed robbery or burglary guilty verdicts, we address only Mayhugh's contentions with respect to his theft conviction.  When considering whether the evidence is sufficient to support an appellant's conviction, we neither reassess witness credibility nor reweigh the evidence, as those tasks are reserved to the fact-finder.  Delagrange v. State, 5 N.E.3d 354, 356 (Ind. 2014).  Rather, we consider only the evidence most favorable to the conviction, and we will affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.  Id.

To prove theft, as a Class D felony, as charged, the State was required to show that Mayhugh

> did knowingly exert unauthorized control over the property of Keith Vaughn, to wit:  lawful United States currency, with the intent to deprive the said Keith Vaughn of the value and use thereof, by taking and possessing said item(s) without the knowledge or consent of the said Keith Vaughn, contrary to the form of the statutes in such cases made and provided by I.C. [§] 35-43-4-2(a) and against the peace and dignity of the State of Indiana.

Appellant's App. at 19 (emphasis added).  As Mayhugh points out, the State presented no evidence that he stole any money from Vaughn.  Thus, Mayhugh contends, the evidence is insufficient to support his theft conviction.  We must agree.

The trial court instructed the jury that it could convict Mayhugh for theft if it determined that he had stolen money from Vaughn.  But, as the State acknowledged in its

12

closing argument, "you don't have much [evidence], if any to be honest, about cash being taken" from Vaughn. Tr. at 498-99. Nevertheless, on appeal, the State argues that the jury could have concluded that Mayhugh stole money from Vaughn because Mecum had planned to steal the $40,000 that Vaughn allegedly kept at his house and there was evidence that the trio had gone through drawers and looked under the mattress at Vaughn's house the night of the murder. But the mere suspicion or possibility of guilt is not sufficient to sustain a conviction. Bunting v. State, 731 N.E.2d 31, 35 (Ind. Ct. App. 2000), trans. denied. There is no factual basis in the record that would support a reasonable inference either that money was missing from Vaughn's house or that Mayhugh stole any money from Vaughn. We hold that the State did not present sufficient evidence to support Mayhugh's conviction for theft as charged. We vacate Mayhugh's theft conviction.[1]

**Issue Three: Sentence**

Finally, Mayhugh contends that his sentence is inappropriate in light of his character. Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana Constitution "authorize[ ] independent appellate review and revision of a sentence imposed by the trial court." Roush v. State, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007) (alteration original). This appellate authority is implemented through Indiana Appellate Rule 7(B). Id. Revision of a sentence under Appellate Rule 7(B) requires the appellant to demonstrate

---

[1] Because we vacate Mayhugh's theft conviction, we need not address his allegation that his convictions for felony murder and theft violate double jeopardy principles. Neither do we address Mayhugh's contention that his conviction should be reversed because of a fatal variance between the information and proof at trial.

13

that his sentence is inappropriate in light of the nature of his offenses and his character. See App. R. 7(B); Rutherford v. State, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate. Gibson v. State, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006). However, "a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." Roush, 875 N.E.2d at 812 (alteration original).

The Indiana Supreme Court has also stated that "sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." Cardwell v. State, 895 N.E.2d 1219, 1222 (Ind. 2008). Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented. See id. at 1224. The principal role of appellate review is to attempt to "leaven the outliers." Id. at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." Id. at 1224.

The trial court sentenced Mayhugh to sixty years. The sentencing range for murder is forty-five years to sixty-five years, with an advisory sentence of fifty-five years. Ind. Code § 35-50-2-3. Mayhugh asks that we revise his sentence to fifty years.

Mayhugh makes no argument that his sentence is inappropriate in light of the nature of the offense. Mayhugh acknowledges that Vaughn, who was disabled, was "brutally murdered." Appellant's Br. at 32. But, he maintains, "this Court should still

14

find that [Mayhugh]'s enhanced sentence is inappropriate in light of his character." Id. In support of that contention, Mayhugh points out that this is his first felony conviction; he is a "loving" father of four children who "has always worked hard to support his family"; and he "completed the Celebrate Recovery program while incarcerated in the Vanderburgh County Jail, a Biblically-based 12-step recovery program." Id. at 31.

But the State correctly points out that this court must consider both the nature of the offense and Mayhugh's character in conducting an analysis under Appellate Rule 7(b). And the State describes the circumstances of Vaughn's murder as follows:

> The pathologist who assisted the Vanderburgh County Coroner's office, Elmo Griggs, testified that in addition to the fatal wound to the right side of Vaughn's neck and head, which cut the jugular vein and carotid artery, Vaughn also suffered multiple additional cuts and stabs to his face and body, mostly in the upper chest, head and neck area. Vaughn also suffered hemorrhaging and bruising. Vaughn also suffered defensive wounds in the form of multiple cuts to his hands and fingers. Vaughn also suffered a dozen or more superficial cuts and stab wounds in and around his chin. A slash wound to the right side entered in through the orbit of his right eye. This one was consistent with a serrated knife. Vaughn bled to death, primarily from the fatal wound that penetrated the jugular and carotid, but before bleeding to death, and either before, or during, the time in which he suffered the additional dozen or more stabs and cuts, Vaughn was also strangled: a ligature mark on his neck, and a cord to the base of a cordless telephone wrapped around his neck, caused changes in his lungs that are consistent with suffocation and/or asphyxia, namely, petechial, or small hemorrhages to the lungs from broken capillaries, proving constriction of his airway. In other words, before bleeding to death, or while bleeding to death, Defendant and/or his accomplices inflicted upon Vaughn dozens of additional stabbing wounds including at least one to the eye, and strangled him on top of all of that. According to the pathologist, the one cut would have done the job, but Defendant and his accomplices went farther than what either death or the statute prohibiting murder would have required of them.

Appellee's Br. at 27-28 (citations omitted). The State also points out that Mayhugh knew about Vaughn's disability before the night of the murder. And the State also contends

15

that Mayhugh's allegations that he acted in self-defense or in defense of Levi are especially galling in light of Vaughn's disability. We cannot say that Mayhugh's sentence is inappropriate in light of the nature of the offense.

With respect to Mayhugh's character, the State points out that he has admitted to an almost ten-year crack cocaine addiction and methamphetamine abuse. At the time of his arrest for Vaughn's murder, Mayhugh was using methamphetamine once or twice per week. And, when asked about the quantity of methamphetamine he took "per sitting," he stated, "Enough to get ****ed up." Appellant's App. at 113. Mayhugh's criminal history consists of five misdemeanor convictions, including a conviction in 2001 for "Assault Caus[ing] Bodily Injury." Id. at 115. And the presentence investigation report states that Mayhugh is "a high risk to re-offend." Id. at 112. While Mayhugh's criminal history is relatively minor, we cannot ignore his long history of untreated substance abuse, which reflects a very poor character. And Mayhugh's sentence is not an outlier. We cannot say that Mayhugh's sixty year sentence is inappropriate in light of the nature of the offense and his character.

### Conclusion

The trial court did not abuse its discretion when it admitted the challenged evidence at trial. But we hold that the State presented insufficient evidence to prove theft as charged, and we reverse Mayhugh's theft conviction. Finally, Mayhugh's sentence is not inappropriate in light of the nature of the offense and his character.

Affirmed in part and reversed in part.

VAIDIK, C.J., and BROWN, J., concur.

16