William MINNICK, Defendant–Appellant,

v.

STATE of Indiana, Plaintiff–Appellee.

No. 47S00–9008–PD–497.

Supreme Court of Indiana.

July 13, 1998.

See also, 467 N.E.2d 754.

Lorinda Meier Youngcourt, Evans, Dowling & Youngcourt, P.C., Indianapolis, Kevin P. McGoff, Kiefer & McGoff, Indianapolis, for Defendant–Appellant.

Pamela Carter, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Plaintiff–Appellee.

## ON APPEAL FROM DENIAL OF POST–CONVICTION RELIEF JULY 13, 1998.

DICKSON, Justice.

This is an appeal from the denial of post-conviction relief. In the defendant's first trial, he was found guilty of murder, robbery, and rape, and the jury recommended the death penalty. The trial court agreed and ordered a death sentence. On appeal, the judgment was reversed and remanded

for new trial. *Minnick v. State*, 467 N.E.2d 754 (Ind.1984), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3512, 87 L.Ed.2d 642 (1985) ("*Minnick* I"). Upon retrial, the defendant was again found guilty of murder, robbery, and rape, but the jury recommended against the death penalty. Notwithstanding this recommendation, the trial judge ordered the death penalty imposed. We affirmed on direct appeal. *Minnick v. State*, 544 N.E.2d 471 (Ind. 1989) ("*Minnick* II").[1] The defendant then filed for postconviction relief. After a substantial evidentiary hearing, the post-conviction court issued thorough findings of fact and conclusions of law and denied relief. The defendant now appeals from this judgment, claiming error related to the following: (1) prosecutorial misconduct; (2) ineffective assistance of counsel; (3) the trial court's use of non-statutory aggravators in imposing the death penalty; (4) the trial court's decision not to follow the jury's recommendation against the death penalty; and (5) various challenges to the facial validity of the death penalty statute. We affirm the judgment of the post-conviction court.

■ When appealing a negative post-conviction judgment, the defendant must convince the reviewing court that the evidence is without conflict and, as a whole, leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *Spranger v. State*, 650 N.E.2d 1117, 1119 (Ind.1995); *Fleenor v. State*, 622 N.E.2d 140, 142 (Ind.1993), *cert. denied*, 513 U.S. 999, 115 S.Ct. 507, 130 L.Ed.2d 415 (1994).

### Prosecutorial Misconduct

The defendant contends that the post-conviction court erred in rejecting his claim that he was denied a fair trial by various acts of prosecutorial misconduct, including: failing to disclose evidence favorable to the defendant; intentionally presenting false evidence; obtaining blood samples from the defendant without a court order; intentionally violating a discovery order; and making improper argument to the jury and the court.

The defendant contends that the prosecutor withheld evidence regarding serology

tests known at the time of the defendant's second trial and that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. However, following that trial, further testing erased the value to the defense of the undisclosed evidence. In spite of this fact, the defendant sought yet another trial, this time based on newly-discovered evidence. The trial court's denial of his motion was raised as an issue in the defendant's direct appeal following his second trial. After hearing oral argument therein, this Court suspended consideration of the appeal and remanded to the trial court for a limited hearing regarding the tests. After hearing evidence, the trial court found that "the new evidence would not change the outcome upon retrial." *Minnick II*, 544 N.E.2d at 474. This Court affirmed, holding that, "The newly-discovered serological evidence would not, therefore, be likely to produce a different result upon retrial." *Minnick II*, 544 N.E.2d at 471.

In his subsequent post-conviction proceeding, from which the present appeal has been taken, the defendant claimed a failure to disclose exculpatory evidence, the State's use of false evidence, and prosecutorial misconduct. The post-conviction court rejected the claim, concluding that "the *Brady* rule applies to exculpatory evidence" and the defendant's direct appeal in *Minnick II* "has already found such evidence was not exculpatory." Record at 1360. Invoking res judicata as to the issue of whether the evidence was exculpatory and would have caused a different outcome, the post-conviction court concluded that the defendant was not entitled to a windfall, was not prejudiced by not being allowed to use information which later proved to be false, and therefore was not deprived of a trial that was fair and reliable.

■ The defendant now contends that, in our previous review of his conviction, there was no issue raised, and thus no judicial review, of a *Brady* violation, the State's use of false evidence, or the cumulative effect of prosecutorial misconduct. The State responds that the defendant has forfeited these

---

1. The details of Minnick's crimes are fully discussed in *Minnick II*.

issues by not raising them on direct appeal. Issues available to the defendant on direct appeal which are not raised are generally forfeited. *Spranger v. State,* 650 N.E.2d 1117, 1121 (Ind.1995); *Lowery v. State,* 640 N.E.2d 1031, 1036–37 (Ind.1994), *cert. denied,* 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995). We agree with the State that forfeiture applies, except to the extent that these claims may support the defendant's claim of ineffective assistance of appellate counsel, which we address *infra.*

In addition to his claim of concealment and wrongful use of serology test evidence, the defendant asserts that the prosecutor intentionally violated a discovery order, made improper arguments to the jury and to the court, and improperly obtained the defendant's blood sample after trial. He argues that these actions constitute prosecutorial misconduct which require a reversal of his convictions and sentence. Because these other issues were available on direct appeal but were not raised, the defendant's claims of prosecutorial misconduct are forfeited.

**Ineffective Assistance of Counsel**

■ The defendant alleges that he was denied the right to effective assistance of counsel by: (1) the trial court's refusal or reluctance to pay defense counsel's fees and necessary investigation or expert witness fees; (2) the failure of defense counsel to adequately prepare for the guilt phase of the trial; (3) the failure to adequately present mitigation in the sentencing hearing; and (4) the failure of appellate counsel to submit a complete record and to present claims of prosecutorial misconduct, including suppression of evidence and presentation of false evidence.[2] The post-conviction court found that defense counsel's performance during the guilt phase of the trial was above the minimum standard required and, thus, the defendant was not denied the effective assistance of counsel. Although noting a deficiency of counsel during the sentencing phase, the post-conviction court found that the defendant was not prejudiced by such performance.

In the defendant's first claim of ineffective assistance, he relies on *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674, 696 (1984),[3] and *United States v. Cronic,* 466 U.S. 648, 659 n. 25, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657, 668 (1984), to support his claim that a denial of effective representation can be presumed when certain conditions exist.

■ The Court in *Cronic* observed that limited circumstances of extreme magnitude may justify "a presumption of ineffectiveness" and such circumstances are, in and of themselves, "sufficient without inquiry into counsel's actual performance at trial." *Id.* at 662, 104 S.Ct. at 2048, 80 L.Ed.2d at 670. Such circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658, 104 S.Ct. at 2046, 80 L.Ed.2d at 667. As noted by Justice Powell, *Cronic* stands for the proposition that, "[i]n such circumstances, the defendant is in effect deprived of counsel altogether, and thereby deprived of *any* meaningful opportunity to subject the State's evidence to adversarial testing." *Kimmelman v. Morrison,* 477 U.S. 365, 395 n. 2, 106 S.Ct. 2574, 2593–94, 91 L.Ed.2d 305, 333 (1986) (Powell, J., concurring) (emphasis added).

*Cronic* provides a narrow "exception" to the traditional *Strickland* analysis. Under *Cronic,* certain circumstances negate the *Strickland* requirement that a defendant establish both deficient performance and actual prejudice. However, if the circumstances do not give rise to a *Cronic* exception, the defendant must fulfill the individualized requirements of *Strickland. See Cronic,* 466

2. The defendant also claims in a footnote that his attorney's failure to object to certain arguments of the prosecutor is error. Brief of Petitioner–Appellant at 58 n. 19. However, he presents no substantial support or argument on this point and it is thus forfeited. Ind.Appellate Rule 8.3(A)(7); *Hebel v. Conrail, Inc.,* 475 N.E.2d 652, 659 (Ind.1985).

3. As to the denial of funds, the defendant cites *Strickland* only for its reference to the presumption of prejudice found in *Cronic,* not for its holding regarding particular errors of trial counsel. Thus, we will not engage in a separate analysis of individualized error regarding the denial of funds.

U.S. at 659 n. 26, 104 S.Ct. at 2047, 80 L.Ed.2d at 668.

■ *Cronic* delineated three circumstances justifying this presumption: (1) the complete denial of counsel; (2) situations when counsel entirely fails to subject the State's case to meaningful adversarial testing; and (3) situations where surrounding circumstances are such that, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659–60, 104 S.Ct. at 2047, 80 L.Ed.2d at 668. In the present case, the defendant argues that the trial judge's denial of funding requests for experts and his extensive delay in paying the public defender fees for the first appeal and second trial resulted in trial counsel essentially having to try the case without any compensation. These circumstances are alleged to have prevented trial counsel from providing counsel as required by the Sixth Amendment. Thus, the defendant is attempting to prove the third circumstance identified in *Cronic* to establish that these unfavorable conditions justify a presumption of ineffective assistance.

■ To establish his *Cronic* claim, the defendant must have proven to the post-conviction court that the surrounding circumstances completely deprived the defendant of any meaningful opportunity to subject the State's evidence to adversarial testing. *Kimmelman*, 477 U.S. at 395 n. 2, 106 S.Ct. at 2593–94, 91 L.Ed.2d at 333 (Powell, J., concurring). As this is an appeal from a post-conviction negative judgment, the defendant must now convince this Court that the evidence presented during the post-conviction proceeding is without conflict and, as a whole, leads unerringly and unmistakably to a decision opposite the post-conviction court's decision. *Spranger*, 650 N.E.2d at 1119.

■ The "surrounding circumstances" claimed by the defendant include the absence of funds to pay defense counsel and to hire experts. The defendant claims that counsel "was unable to hire experts because he felt the trial court would not approve his request for fees." Brief of Petitioner–Appellant at 69. However, absent a request for funds with which to hire an expert, the defendant cannot show that his request would necessarily have been denied, and he thus fails to prove this "surrounding circumstance." As to the lack of funds to pay defense counsel, the defendant does not show how the lack of payment denied him any meaningful opportunity to challenge the State's case. He was in fact represented throughout the second trial by defense counsel who had previous experience with other serious criminal cases and had served as defense counsel for defendant's first trial. The defendant has not shown that the post-conviction evidence unequivocally establishes that the surrounding circumstances completely deprived him of any meaningful opportunity to contest the State's case.

■ As to the remainder of his claim of ineffective assistance of counsel, the defendant relies upon allegations of individualized errors. To establish such claims in the post-conviction proceeding, the defendant was required to show both that counsel's performance was deficient, making errors so serious that the counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment, *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693, and that, because of such deficient performance, the result was fundamentally unfair and unreliable. *Lockhart v. Fretwell*, 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180, 189 (1993).

Upon review of the post-conviction court's denial of the defendants claim of ineffective assistance of counsel, we determine whether the evidence leads unerringly and unmistakably to an opposite decision. *Spranger*, 650 N.E.2d at 1119. "[I]t is only where the evidence is without conflict and leads to but one conclusion, and the [post-conviction] court has reached an opposite conclusion, that the decision will be disturbed." *Fleenor*, 622 N.E.2d at 142. Thus, we must determine if the post-conviction evidence unerringly leads to a conclusion contrary to that of the post-conviction court regarding counsel's

performance or the fundamental fairness or reliability of the result.

■ As to the defendant's claim that trial counsel did not adequately prepare for the guilt phase of the trial, the defendant alleges on appeal that trial counsel did not request funds to hire expert consultants, that he failed to take action when he learned that the State had initiated further serology tests, and that he conducted an inadequate cross-examination of the State's forensic pathologist. Because the defendant's final amended post-conviction petition did not claim denial of counsel from the failure to request funds, this specific claimed failure is not available in this appeal.

■ The post-conviction court found that defense counsel would have been remiss in seeking a delay for additional testing which would likely be detrimental to the defendant. Comparing the post-conviction examination of the State's forensic witness with the cross-examination conducted by the defense at trial, the post-conviction court found that the alleged omissions were insignificant and that trial counsel's performance was "certainly not ineffective." Record at 1373. The defendant has not established that the evidence compels a conclusion opposite that of the post-conviction court.

The defendant further contends that, in the preparation for the penalty and sentencing phases, his trial attorney did not pursue extensive evidence of the defendant's childhood, his home situation, or his impaired mental or emotional state. He contends that, in light of testimony that was available but not presented during the trial court penalty and sentencing proceedings, his death sentence lacks reliability. However, our task in reviewing this claim is to determine whether the evidence leads unerringly to a decision opposite that reached by the post-conviction court.

■ Noting the fact that the jury returned a verdict recommending against imposing the death penalty, thus rendering any alleged deficiencies of counsel in the penalty phase devoid of resulting prejudice, the post-conviction court correctly concluded that the focus must be on the subsequent sentencing hearing. After an extensive review of the evidence, the post-conviction court found that the defendant's trial counsel was "below standard" in preparing and presenting evidence for consideration by the trial court at sentencing, but that "[w]hat little evidence of mitigation there exists is far outweighed by the aggravating factors." Record at 1396. The post-conviction court's conclusion included the following:

The evidence presented by the Petitioner most often cut both ways. Petitioner was not from a rich home, but from a lower class working home. His natural parents were divorced and during his very early years, the family moved frequently. However, this family finally settled down early in his school career. He was provided for, kept clean, fed, and clothed. Although his step-father was strict, there was no abuse except in a few isolated cases, and even that was not proven except by speculation. He was not sexually abused. Except for being a sad child, no evidence of mental defect or disease exists.

The evidence of more serious conflict in the home with parents is in the late teens. This is after he has been convicted of theft and burglary and sent to the Indiana Boys School.

The picture developed by the Petitioner in conjunction with evidence presented by the State is that the Petitioner is a sociopath with an antisocial personality. A personality which blames others for his own mistakes, will not learn from punishment, and has little concern for others. He is surrounded only with concern for himself. Experience teaches him little. This is not mitigation evidence.

The Petitioner has had four (4) years to produce mitigating evidence and has not succeeded. Most of the witnesses were subpoenaed and but for being called as witnesses and ask[ed] questions, did little if anything to create evidence of mitigation. Minnick was not prejudiced by his attorney not calling witnesses called by the Petitioner in his PCR hearing, for they provided little if anything that could not be overcome by the State on rebuttal.

Record at 1395–96. When, as here, the post-conviction court finds that, notwithstanding a claim of attorney deficiency, the resulting judgment was fair and reliable, our focus is on whether there is evidence supporting the post-conviction court's judgment. *Games v. State*, 690 N.E.2d 211, 214 (Ind.1997), *pet. for cert. filed*, (May 13, 1998) (No. 97–9143). The evidence presented amply supports the post-conviction court's finding on this issue. The defendant has not established that the evidence compels a conclusion opposite that of the post-conviction court.

The defendant also contends that his appellate counsel was ineffective by failing to include in the Record of Proceedings a copy of the pre-sentence investigation report and by failing to raise, during the remand hearing and in his supplemental brief during his direct appeal, the State's failure to provide exculpatory evidence, the State's presentation of false witnesses, and prosecutorial misconduct. The post-conviction court rejected the defendant's claim.

■■■■■ The standard of review for claims of denial of the right to appellate counsel is the same as that used for trial counsel. *Lowery v. State*, 640 N.E.2d 1031, 1048 (Ind. 1994), *cert. denied*, 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995). We note that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. Stating, "[t]he object of an ineffectiveness claim is not to grade counsel's performance," the Court instructed that, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* In our inquiry into prejudice, we must determine whether the result reached was fundamentally fair or reliable. *Games*, 690 N.E.2d at 214.

■■■■ The defendant argues that his counsel's failure to include a copy of the presentence investigation report deprived him of meaningful appellate review of the appropriateness of his death sentence. The post-conviction court did not address the merits of

this claim, finding it to have been presented upon the defendant's previous direct appeal and thus barred by the doctrine of res judicata. We find that the issue now presented was not addressed in our opinion in *Minnick II* and thus requires consideration. To prevail on this claim, the defendant must demonstrate both the deficient performance of counsel and a fundamentally unfair, unreliable result. We find the latter element determinative. The contents of the pre-sentence report are generally consistent with the post-conviction court's conclusions quoted above as to available mitigation. The omitted report does not provide any appreciable degree of further information. In determining the appropriateness of the death penalty on direct appeal, this Court held:

> In the instant case, however, the evidence at trial revealed that appellant shares his culpability with no one. He alone bears criminal responsibility for this singularly brutal homicide in the course of which the victim was raped, sodomized, stabbed, bludgeoned, strangled, and electrocuted. In light of these circumstances, it seems fair to state that no reasonable person would find a death sentence inappropriate here.

*Minnick II*, 544 N.E.2d at 482. We hold that, despite the claimed failure of counsel to include the pre-sentence investigation report in the Record of Proceedings submitted on direct appeal, the resulting death sentence is not fundamentally unfair or unreliable.

In his remaining post-conviction allegations of denial of counsel, the defendant contended that his appellate counsel failed to assert claims related to the State's handling of certain test results, specifically that the State concealed exculpatory evidence, presented a false witness, and committed prosecutorial misconduct. The defendant now asserts that the post-conviction court erred in its denial of this claim.

■■■■ At trial, the defense argued that the defendant was merely an accomplice under the substantial domination of another person. At the time of the defendant's first trial, the State conducted serological tests on a piece of carpet extracted from the victim's home

containing semen samples. These tests showed two different areas of semen, both of which came from blood-type O secretors. Blood tests revealed that both the defendant and the victim's husband were blood-type O secretors, thus the defendant was not excluded as the source of the semen. Prior to the defendant's second trial, the prosecutor ordered further testing of semen samples taken from carpet at the victim's home, this time by the Serological Research Institute ("SERI"). This later test contradicted the results of the first test and revealed that the two sources on the carpet were from a secretor and a non-secretor. This would have had the tendency to show the presence of an unknown third-party source, which could have bolstered the defense's theory that the defendant was merely an accomplice under the substantial domination of another person. However, the prosecutor never revealed to the defense that he had ordered the tests, nor did he disclose the results of those tests when they came back prior to the conclusion of the second trial. Following the trial, however, subsequent blood tests established that the defendant was in fact a non-secretor and that the blood tests from the first trial were wrong, thus rendering the previously favorable evidence unfavorable to the defendant. Thus, where the first tests led to the possibility that the victim's husband was the source of both semen stains, the results of the later tests demonstrate that the husband is now excluded as the source of the second stain, while the defendant cannot be excluded as its source.

In addition to his claims regarding the SERI carpet tests, the defendant also criticizes the State's failure to disclose SERI vaginal swab tests which failed to show the presence of any semen. The jury heard both the testimony of Officer Kuhn that in his test results he had found the presence of semen in the victim and the opposing testimony of Dr. Pless, a Professor of Pathology at Indiana University who had conducted an autopsy of the victim and found no evidence of any semen on any of the swabs he received from the police laboratory.

In *Brady v. Maryland*, the United States Supreme Court held that "the sup-pression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963). To prevail on a *Brady* claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial. *Id.; United States v. Bagley*, 473 U.S. 667, 685, 105 S.Ct. 3375, 3385, 87 L.Ed.2d 481 (1985). Evidence is "material" only if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 685, 105 S.Ct. at 3385, 87 L.Ed.2d at 496.

The defendant also claims that, because the prosecutor knowingly elicited the testimony of police officers contrary to the second test results, he therefore obtained the conviction through false evidence in violation of due process. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959). The failure to disclose exculpatory evidence and use of false evidence cases are inextricably intertwined, and one noted treatise has observed that "the Supreme Court has treated them as based on similar principles and governed by analogous standards." 2 WAYNE R. LaFAVE AND JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 19.5, at 531 (1984). The United States Supreme Court frequently cites the two lines of cases together. *See, e.g., Albright v. Oliver*, 510 U.S. 266, 274 n. 6, 114 S.Ct. 807, 813, 127 L.Ed.2d 114, 124 (1994) (stating that both sets of cases collectively "deal[ ] with the defendant's right to a fair trial mandated by the Due Process Clause of the Fifth Amendment" (citations omitted)); *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2531, 81 L.Ed.2d 413, 420 (1984) (characterizing both lines of cases as a "group of constitutional privileges"); *Smith v. Phillips*, 455 U.S. 209, 220 and n. 10, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 88 (1982) (noting that both lines of cases contain the same basic materiality requirement). We will therefore treat these claims together.

Citing *United States v. Dimas*, 3 F.3d 1015 (7th Cir.1993), and *United States v. Veras*, 51 F.3d 1365 (7th Cir.1995), *cert. denied*, 516 U.S. 999, 116 S.Ct. 540, 133 L.Ed.2d 444,[4] the defendant contends that we should not take into consideration any facts which were discovered after his trial. He seeks to exclude consideration of the fact that he is a non-secretor, which fact renders the undisclosed test results favorable to the State and, thus, precludes a *Brady* violation.

In *Dimas*, the Seventh Circuit considered an alleged *Brady* violation. Remanding for a hearing, the court noted that "the question is whether the result would have changed if the prosecutors disclosed the evidence at the time [of the trial], not whether the outcome would differ if the case were tried today." *Id.* at n. 3. In *Veras*, the defendant also claimed a *Brady* violation. The Seventh Circuit found no *Brady* violation because the suppressed evidence was not material. In so holding, the court rejected the defendant's attempts to use evidence which emerged after he had been convicted, stating that "the *Brady* analysis was limited to the evidence known at the time of trial." *Veras*, 51 F.3d at 1375 (citing the above-quoted language from *Dimas* ).

■ Notwithstanding *Dimas* and *Veras*, the State argues that, to avoid giving a windfall to the defendant, we should take into account the evidence discovered after the second trial under the authority of the Court's decision in *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). In his reply brief, the defendant challenges the application of *Fretwell*, claiming that "*Fretwell* is an ineffective assistance of counsel case and it has no application to a *Brady* analysis." Reply Brief of Appellant at 5 n. 2. To the extent that the defendant presents a *Brady /Bagley* claim in this appeal, however, it arises within the context of

his claim that his appellate counsel should have raised the issue on direct appeal. Thus, the *Fretwell* standard is precisely applicable in our review of the post-conviction court's consideration of the defendant's claim of ineffective assistance.

Furthermore, even if a *Brady /Bagley* claim were being directly presented, rather than in the context of a denial of appellate counsel claim, the evidence discovered after the second trial would nevertheless properly be considered. The "windfall" application in *Fretwell* is in the Court's discussion of the reasonable probability analysis under the prejudice prong of *Strickland*. Significantly, the Court in *Bagley specifically* adopted this same reasonable probability/prejudice prong analysis for its *Brady* materiality/reasonable probability tests:

> [I]n *Strickland*, the Court held that a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." The *Strickland* Court defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome."
>
> We find the *Strickland* formulation … sufficiently flexible to cover … cases of prosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley*, 473 U.S. at 682, 105 S.Ct. at 3384, 87 L.Ed.2d at 494 (citations and footnote omitted). *Accord Kyles v. Whitley*, 514 U.S. 419,

---

4. The defendant also cites *United States v. Oxman*, 740 F.2d 1298 (3rd Cir.1984) for "an excellent discussion of the prospective analysis of *Brady*." Brief of Appellant at 38. Citation to *Oxman*, however, is unfounded. This case was vacated and remanded by the United States Supreme Court for reconsideration in light of *Bagley*. *Id. (vacated and remanded sub nom., United States v. Pflaumer*, 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985)). On remand, the Third

Circuit noted that the *Bagley* materiality standard was "significantly different" than the prospective analysis they used to determine materiality in *Oxman*. *United States v. Pflaumer*, 774 F.2d 1224, 1226 (3rd Cir.1985), *cert. denied*, 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986). Further, the "prospective analysis" used in the original *Oxman* is distinctly different from the analysis the defendant wishes this Court to employ.

434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490, 506 (1995) (noting that the *Bagley* Court "adopt[ed][the] formulation announced in *Strickland v. Washington*"). Because the *Strickland* prejudice formulation has since been refined in *Fretwell*, which specifically rejected a "reasonable probability" analysis that would have restricted its review to the time of the trial, we believe that the time-restrictive holdings of *Dimas* and *Veras* are not applicable here.

In *Fretwell*, the defendant's counsel failed to make an objection that would have been sustained under the law as it existed at the time of trial. The law later changed and, at the time of the defendant's appeal, the objection would have been properly overruled. Similar to the defendant's argument in the present case, the defendant in *Fretwell* argued that the Court should look only to what happened at trial, contending that the "use of hindsight is inappropriate in determining 'prejudice' under *Strickland*, and that this element should be determined under the laws existing at the time of trial." *Fretwell*, 506 U.S. at 371, 113 S.Ct. at 844, 122 L.Ed.2d at 190. However, the Court rejected this argument, stating that the question was whether "the result of the trial [was] unreliable or the proceeding fundamentally unfair." *Id.* at 372, 113 S.Ct. at 844, 122 L.Ed.2d at 191. The Court held that reversing the defendant's conviction would "grant the defendant a windfall to which the law does not entitle him." *Id.* at 370, 113 S.Ct. at 843, 122 L.Ed.2d at 189.

In addition, we note that both *Dimas* and *Veras* were based upon the Seventh Circuit's interpretation of the "reasonable probability" standard from *Bagley* and *Brady*. However, following these decisions, the United States Supreme Court further refined this standard in *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566, 131 L.Ed.2d at 506. *Kyles* requires that the review of a *Brady/Bagley* claim be governed by whether, considering the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Upon the direct review of a *Brady/Bagley* claim, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evi-dence...." *Id.* Rather, the defendant must demonstrate that the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. at 1566, 131 L.Ed.2d at 506.

█ The issue before this Court, however-er, is whether the post-conviction court erred in rejecting the defendant's claim of ineffective assistance of appellate counsel for failure to claim violation of *Brady* and *Napue*. Resolution of this issue rests upon whether the evidence necessarily leads to a conclusion opposite that reached by the post-conviction court. To have found for the defendant, it would have been necessary for the post-conviction court to find both that appellate counsel was deficient and that, because of the deficiencies, the result was fundamentally unfair and unreliable. The defendant fails to establish both prongs of this standard. The blood serology evidence, when including the post-trial blood test, clearly disfavors the defendant. The SERI vaginal swab test results are merely cumulative. Because the new evidence does not put the whole case in such a different light as to undermine confidence in the verdict, the defendant's *Brady* claim would not have been successful had it been raised on appeal. Appellate counsel was not deficient for failing to raise such a claim. *Wallace v. State,* 640 N.E.2d 374, 376 (Ind.1994), *cert. denied,* 514 U.S. 1115, 115 S.Ct. 1972, 131 L.Ed.2d 861 (1995); *Ingram v. State,* 508 N.E.2d 805, 808–09 (Ind.1987). In addition, there is no resulting prejudice because it is clear that the result reached was fundamentally fair and reliable. *Fretwell,* 506 U.S. at 369–70, 113 S.Ct. at 842–43, 122 L.Ed.2d at 189; *Games,* 690 N.E.2d at 214. We strongly disapprove of the State's failure to disclose the serology test results. In another case, without the strange evidentiary metamorphosis present here, a *Brady* violation would almost certainly be found. However, because the post-conviction evidence does not lead to a result opposite that reached by the post-conviction court, we find no error on this issue.

█ The defendant also contends that the post-conviction court erred in rejecting

his claim of denial of appellate counsel for failing to raise the issue of prosecutorial misconduct arising out of these facts. The test for whether prosecutorial misconduct occurred asks: (1) whether the State engaged in misconduct; and (2) whether the misconduct had a probable persuasive effect on the jury's decision. *Cox v. State,* 696 N.E.2d 853, 859 n. 6 (Ind. 1998). As repeatedly noted above, however, a constitutional claim of denial of counsel requires proof not only of attorney deficiency but also of fundamentally unfair and unreliable result. Because the alleged prosecutorial misconduct in failing to disclose the serology evidence, when considered in light of the subsequent blood testing, does not present significant evidence in favor of the defendant, the result was not unfair and unreliable. The post-conviction court did not err in rejecting the claim of denial of appellate counsel in failing to assert prosecutorial misconduct.

## Non–Statutory Aggravators

The defendant claims post-conviction error in rejecting his claim that in sentencing the defendant to death, the trial court improperly considered aggravating circumstances not specified in the death penalty statute and based its decision on matters which the jury was not permitted to consider.

In the defendant's brief in support of his final amended petition for post-conviction relief, he argued that the trial judge considered aggravating circumstances beyond those enumerated in the death penalty statute, contrary to *Bivins v. State,* 642 N.E.2d 928 (Ind.1994), *cert. denied,* 516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996), and *Bellmore v. State,* 602 N.E.2d 111 (Ind.1992). He also contended that the court violated the provision in the death penalty statute that requires the court to base its sentence on "the same standards that the jury was required to consider." Record at 996–98. *See* IND.CODE § 35–50–2–9(b) (1993). The post-conviction court found that the defendant's claims regarding the use of non-statutory aggravators were barred by res judicata.

In his direct appeal in *Minnick II,* the defendant claimed that the sentencing judge "used improper criteria for finding aggrava-

ting and mitigating circumstances which were taken from [the general felony sentencing statutory provisions] which she confused with the aggravating circumstances stated in [the death penalty sentencing provisions]." Appellant's Brief in *Minnick II* at 190–91. We rejected his contention and held that, "as long as at least one of the aggravating circumstances from the death penalty statute is proven and set forth in the sentencing statement, a trial court may find the existence of other statutory aggravators and consider them in regard to capital sentencing." *Minnick II,* 544 N.E.2d at 482.

▬▬▬ Later, in *Bivins,* we revisited the issue and announced a new rule: "When the death sentence is sought, courts must henceforth limit the aggravating circumstances eligible for consideration to those specified in the death penalty statute." 642 N.E.2d at 955. We expressly cautioned, however, that "this new constitutional rule will not be applicable on collateral review to cases which have become final, including those on direct appeal, before the rule was announced." *Id.* at 956. *See Daniels v. State,* 561 N.E.2d 487, 489 (Ind.1990).

The defendant concedes that the *Bivins* rule is not retroactive to his present appeal from the denial of post-conviction relief. Brief of Petitioner–Appellant at 141, n. 46. He argues, however, that his claim presents a basis independent from the new *Bivins* rule. Distinguishing the general felony statute's "specified aggravators," from its "catchall" or "open-ended" aggravator, (*compare* IND.CODE § 35–38–1–7.1(b) *with* § 35–38–1–7.1(d) (1993)), the defendant asserts that the trial court considered various open-ended non-death penalty aggravators (the defendant lists "the decedent's right to be safe in her own home, post-mortem mutilation, the violence of the attempted electrocution, and the strangling and knifing in imposing the death sentence." Brief of Petitioner–Appellant at 142). Citing *Bellmore,* he contends that the capital sentencing court's use of aggravators that fall within the open-ended aggravator of the general felony sentencing statute is unconstitutionally vague. 602 N.E.2d at 129. He urges that *Bellmore* applies retroactively to this collateral proceed-

ing because it did not state a new constitutional rule but was based upon precedent existing when his case became final upon direct appeal.

 The post-conviction court was correct in denying relief on this claim. To the extent that the defendant seeks the retroactive application of a new constitutional rule of criminal proceedings, it is not available to these collateral proceedings. *Bivins,* 642 N.E.2d at 956; *Daniels,* 561 N.E.2d at 489. To the extent that the issue is not governed by such a new rule, it is forfeited by reason of the defendant's failure to raise it in *Minnick II.*

The defendant also asserts that, by including non-statutory aggravating considerations in its decision, the trial court improperly based its decision on matters that the jury was not permitted to consider. IND.CODE § 35–50–2–9(e) (1993); *Thompson v. State,* 492 N.E.2d 264 (Ind.1986). Because this specific claim was available but not raised on direct appeal, the defendant claims fundamental error, citing *Lowery v. State,* 640 N.E.2d 1031 (Ind.1994), *cert. denied,* 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995), to avoid procedural default.

In *Lowery,* the defendant was charged with two murders, and the death penalty count as to each asserted as one of the aggravating circumstances that the defendant had *committed* another murder, referring to the other victim. The jury was so instructed. However, in announcing his findings of fact and conclusions of law, the trial judge found as an aggravating circumstance that the defendant had been *convicted* of another 'murder. In addressing this claim, we summarily recited that "due to the fundamental nature of the error, we will review this issue." *Id.* at 1046. Proceeding to the merits, we denied the claim because we were convinced that the trial judge did apply the same aggravator as had the jury, but simply misspoke, accidentally substituting "convicted" for "committed." *Id.* In the absence of any discussion of fundamental error in *Lowery,* we do not find any binding authority from its election to address the merits of the claim after invoking the phrase "fundamental nature."

 As we recently noted, the "fundamental error" exception to the waiver rule is available only when the record reveals clearly blatant violations of basic and elementary principles of due process, and the harm or potential for harm cannot be denied. *Canaan v. State,* 683 N.E.2d 227, 235–36 n. 6 (Ind.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2064, 141 L.Ed.2d 141 (1998). Furthermore, application of this exception in post-conviction proceedings is generally limited to instances of deprivation of Sixth Amendment right to counsel or to an issue demonstrably unavailable to the petitioner in prior proceedings. *Id.* As to the defendant's claim of error here, we decline to find any fundamental error. We find this claim forfeited by the failure to raise it on direct appeal. The post-conviction court did not err in rejecting the defendant's claim on this issue.

## Disregard of the Jury's Recommendation

The defendant urges that the post-conviction court erroneously refused his claim that the trial court erred in disregarding the jury's recommendation and ordering a death sentence. The post-conviction court held that this issue was also barred by res judicata. In *Minnick II,* the defendant argued that the trial court failed to consider the jury's recommendation against the death penalty. 544 N.E.2d at 481. After discussing our standard of review in cases where the trial court imposes a death sentence notwithstanding a contrary jury recommendation, we affirmed the sentence, concluding that the trial court did not fail to consider the jury recommendation. *Id.* at 482. The defendant presents two arguments to avoid the doctrine of res judicata. First, he argues that it should not apply because the issue was addressed in his direct appeal sua sponte by the court, without his having raised it and, thus, without the court having the benefit of a full adversarial briefing. Second, he argues that we incorrectly decided the issue in his direct appeal, resulting in manifest injustice.

 This Court has noted that, "where an issue, *although differently designated,* was previously considered and deter-

mined upon a criminal defendant's direct appeal," res judicata is applicable to bar its consideration in post-conviction relief proceeding. *Cambridge v. State*, 468 N.E.2d 1047, 1049 (Ind.1984) (emphasis in original). The defendant has cited us to no authority holding the doctrine of res judicata to be inapplicable when a court's prior decision decides an issue sua sponte. We have recognized that, despite claims of res judicata, a court may correct an error in its prior holding, but only in extraordinary circumstances such as where the initial decision was "clearly erroneous and would work manifest injustice." *Arthur v. State*, 663 N.E.2d 529, 531 (Ind.1996), *quoting State v. Lewis*, 543 N.E.2d 1116 (Ind.1989).

■ Notwithstanding this Court's prior evaluation of the trial court's death sentence contrary to the jury's recommendation, applying *Martinez Chavez v. State*, 534 N.E.2d 731 (Ind.1989), the defendant asks that we now provide independent reconsideration of the death sentence, alleging that our current appellate standard of review is prescribed in *Roark v. State*, 644 N.E.2d 565 (Ind.1994), which modified *Martinez Chavez*. More recently, in *Peterson v. State*, 674 N.E.2d 528, 539–40 (Ind.1996), *cert. denied*, — U.S. —, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998), we reexamined our standard of review, including our developing jurisprudence in *Martinez Chavez, Roark*, and other capital cases. To resolve possible inconsistencies, we declared the following as the standard for appellate review in those cases where a death sentence is ordered notwithstanding a contrary jury recommendation:

> As part of our death penalty review, we will independently consider the jury recommendation against death and determine whether the death penalty is appropriate. However, we will *not* employ a standard that requires the facts in the record to so clearly point to the imposition of the death penalty that the jury's recommendation is unreasonable.

*Id.* at 540.

■ When we affirmed the defendant's death sentence in *Minnick II*, we expressly noted the jury's recommendation and discussed the attendant circumstances of the crime and the defendant's culpability. It is clear that we found the death penalty appropriate. Because our decision in *Minnick II* was not clearly erroneous and does not work a manifest injustice, the post-conviction court was correct to find this claim barred by res judicata.

## Facial Validity of the Death Penalty Statute

■ The final allegation of error raised by the defendant is that Indiana's death penalty statute is unconstitutional under the federal and state constitutions. The defendant makes three arguments in this regard: (1) the death penalty statute does not adequately restrict the discretion of the prosecutor in deciding in which cases to pursue the death penalty; (2) the statute does not adequately channel the discretion of the jury and judge (which claim includes several arguments); and (3) the statute fails to provide meaningful standards for appellate proportionality review. As the defendant notes, this Court has frequently upheld the constitutionality of the Indiana death penalty statute, rejecting many of the claims which he raises. *See, e.g., Harrison v. State*, 644 N.E.2d 1243, 1259 n. 28 (Ind.1995) (rejecting the defendant's claim that the jury should make written findings); *Bivins v. State*, 642 N.E.2d 928, 946–48 (Ind. 1994), *cert. denied*, 516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996) (citing to several cases in the course of rejecting both the first and third claims made by the defendant in this case and also rejecting the defendant's claim that the jury's recommendation must be unanimous); *Miller v. State*, 623 N.E.2d 403, 409–10 (Ind.1993) (rejecting the defendant's burden of proof argument on the second claim); *Fleenor v. State*, 514 N.E.2d 80, 91–92 (Ind.1987), *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988) (rejecting the defendant's claim that the requirements for specificity in the judge's findings upon imposing the death penalty are insufficient); *McNary v. State*, 428 N.E.2d 1248, 1252 (Ind.1981) (holding that juries need not be instructed on words which can be understood by their common meanings, thus rejecting the defendant's contention that factors such as "significant criminal history,"

"substantially impaired," and "extreme emotional distress," need to be defined). We decline the defendant's request to depart from this established precedent.

■ As to the claim that the statute does not adequately channel the discretion of the judge and jury, the defendant contends that the Indiana death penalty statute's catch-all mitigator, "any other circumstances appropriate for consideration," [5] unconstitutionally dilutes the significance or persuasiveness of a myriad of mitigating circumstances. However, the defendant has presented no evidence whatsoever that such dilution actually occurred in this case. Additionally, it is apparent that the legislature's choice to allow death penalty defendants to present every conceivable mitigator is in compliance with *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which requires that "the sentencer . . . not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. at 2964–65, 57 L.Ed.2d at 990 (emphasis in original). We hold that the statutory "catch-all" mitigator does not violate constitutional requirements.

## Conclusion

We affirm the post-conviction court's denial of the defendant's petition for post-conviction relief.

SHEPARD, C.J., and SELBY and BOEHM, JJ., concur.

SULLIVAN, J., dissents with opinion.

SULLIVAN, Justice, dissenting.

I respectfully dissent. Justice Dickson's opinion uses procedural grounds to dispose of Minnick's two most substantial claims to post-conviction relief: that in imposing the death penalty the trial court (1) improperly invoked non-statutory aggravating circumstances and (2) improperly overrode a jury recommendation against death. I believe that we should examine the merits of both

claims. And I would resolve the merits of both claims in Minnick's favor.

### I

I readily acknowledge that many claims—perhaps the vast majority of claims—for post-conviction relief are properly resolved on procedural grounds. This is as it should be because, as we often say, post-conviction proceedings are not appeals but specialized, quasi-civil actions in which only narrowly circumscribed claims are available. Ind.Post–Conviction Rule 1(1); *see Lowery v. State*, 640 N.E.2d 1031, 1036 (Ind.1994) (the post-conviction remedy is not a substitute for an appeal), *cert. denied* 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995); *Weatherford v. State*, 619 N.E.2d 915, 916 (Ind.1993) (post-conviction procedures do not provide a "super appeal"). In the most general of terms, claims for post-conviction relief are limited to those demonstrably unavailable at the time of trial and direct appeal and those of deprivation of the constitutional right to effective assistance of counsel. *See Canaan v. State*, 683 N.E.2d 227, 235 n. 6 (Ind.1997), *reh'g denied, cert. denied* —— U.S. ——, 118 S.Ct. 2064, 141 L.Ed.2d 141 (1998). Both of Minnick's principal claims—improper trial court invocation of non-statutory aggravating circumstances and override of the jury's recommendation against death—were addressed in Minnick's direct appeal and resolved against him. *Minnick v. State*, 544 N.E.2d 471, 482 (Ind.1989). In almost all circumstances, the doctrine of *res judicata* proscribes relitigation of such claims in post-conviction proceedings. But I believe that circumstances of these two claims unique to this case place them outside the *res judicata* bar.

### A

In his direct appeal, Minnick argued that non-statutory aggravators were improperly used to sentence him to death. This court, by a vote of 3–2, explicitly rejected Minnick's claim. *Minnick*, 544 N.E.2d at 482. *Minnick* held that "in a capital sentencing the trial court may consider other general felony statutory aggravators even if not included

---

5. IND.CODE § 35–50–2–9(c)(8) (1993).

among the death penalty statutory aggravators, as long as at least one of the capital statutory aggravators is proven." *Bellmore v. State,* 602 N.E.2d 111, 128 (Ind.1992) (footnote omitted).

*Bivins v. State,* 642 N.E.2d 928 (Ind.1994), overruled the holding in *Minnick.* In *Bivins,* we held that "[w]hen the death sentence is sought, courts must henceforth limit the aggravating circumstances eligible for consideration to those specified in the death penalty statute." *Id.* at 955. The question then is whether the *Bivins* rule should be applied retroactively to Minnick's case. As Justice Dickson's opinion points out, there is language in *Bivins* itself to the effect that it should not be applied retroactively. The *Bivins* opinion pronounces that it is a new rule of constitutional law, *id.* at 956; that it is not available to petitioners whose cases have become final before the rule was announced, *id.* at 956 (citing *Daniels v. State,* 561 N.E.2d 487, 489 (Ind.1990)); and that it did not "fall within either of the two narrow exceptions to the non-retroactivity of new rules on collateral review," *id.* at 956 n. 12 (citing *Daniels,* 561 N.E.2d at 490). But *Bivins* was before us on direct appeal and so the court's pronouncements on retroactivity were *obiter dicta.*[1] I fully subscribe to the doctrine of non-retroactivity announced in *Daniels. See, e.g., State v. Mohler,* 694 N.E.2d 1129 (Ind.1998). And while I believe that in most circumstances the *Bivins* rule should be subject to the *Daniels* bar, I would not so hold here.

In *Daniels,* we adopted as our state retroactivity rule the same retroactivity rule used by the U.S. Supreme Court for reviewing habeas corpus petitions for relief from state judgments. *Daniels,* 561 N.E.2d at 489 (citing *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)). In support of our decision to follow the federal rule, we observed that the purposes for which Indiana affords the remedy of post-conviction relief are substantially similar to those for which the federal writ of habeas corpus is made avail-

able—finality and the efficient administration of justice. *Mohler,* 694 N.E.2d at 1132; *Daniels,* 561 N.E.2d at 489. This is certainly true. But the federal rule is also grounded in principles of comity—federalism's interest in respecting state court judgments. *See Teague,* 489 U.S. at 308, 309, 109 S.Ct. 1060. As Professor Hutton has noted, the absence of the interest in comity differentiates the constraints on federal and state retroactivity rules. Mary C. Hutton, *Retroactivity in the States: The Impact of Teague v. Lane on State Post–Conviction Remedies,* 44 Ala. L.Rev. 421, 436–37 (1993).

In sum, a state's retroactivity rule need not be the same as the federal and, because the constraints on the federal and state systems differ, there may be situations where they should not be the same. I think this case is an example of the latter. I would hold that in Indiana, the rule of non-retroactivity should not apply to claims for post-conviction relief in cases in which a sentence of death has been imposed and the petitioner who seeks retroactive application of this court's new rule raised precisely the same claim in his or her direct appeal and had it rejected by this court. That is, where this court adopts a new rule which overrules the explicit prior adverse determination of this court in a particular defendant's death penalty case, that new rule ought to be retroactive to that particular litigant. I view this as an extremely narrow exception which would not apply to those petitioners who did not explicitly raise the issue in their direct appeal. These litigants never felt the impingement of the old rule and so there is no injustice in denying application of the new rule to them. But I cannot justify on grounds of either finality or efficient administration of justice the refusal to allow a capital litigant the benefit of a rule that that very litigant timely raised and argued to us on direct appeal.

### B

I also believe Justice Dickson's opinion gives inappropriately abrupt treatment to Minnick's claim that the trial court erred in disregarding the jury's recommendation that

---

1. I expressed my reservations about the inclusion of this language in my separate opinion in *Bivins v. State,* 642 N.E.2d 928, 960 (Ind.1994) (Sulli-

van, J., concurring in part and concurring in result).

he not be sentenced to death. At the time Minnick filed his direct appeal with us, the state of the law was that neither the trial court nor the court on appeal had any obligation to give deference or special consideration to a jury recommendation against death. *Schiro v. State*, 451 N.E.2d 1047, 1054 (Ind.1983). However, subsequent to the docketing of Minnick's appeal but before it was decided, this court decided *Martinez Chavez v. State*, 534 N.E.2d 731 (Ind.1989). *Martinez Chavez* articulated a new standard of review for cases where the trial court imposes a death sentence notwithstanding the jury's unanimous recommendation against death.[2] Despite the fact that Minnick had not briefed the *Martinez Chavez* issue, the majority addressed it *sua sponte* and held that Minnick was not entitled to relief under the new *Martinez Chavez* rule. Justice Dickson's opinion today finds this determination to be *res judicata*, barring our consideration of it.

Because we applied *Martinez Chavez* adversely to Minnick on direct appeal without his having the opportunity to present an argument in his own behalf, I believe that we should proceed to the merits of his claim and not bar it on procedural grounds.[3]

2. In order to impose a death sentence in such circumstances, we held that "the facts justifying a death sentence should be so clear and convincing that virtually no reasonable person could disagree that death was appropriate in light of the offender and his crime." *Martinez Chavez v. State*, 534 N.E.2d 731, 735 (Ind.1989); *see also Martinez Chavez v. State*, 539 N.E.2d 4, 5 (Ind. 1989) (opinion on reh'g) ("A trial judge can proceed to impose a penalty of death [when the jury has unanimously recommended against death] only ... when all the facts available to the court point so clearly to the imposition of the death penalty that the jury's recommendation is unreasonable.") Minnick was entitled to the benefit of the *Martinez Chavez* rule because his direct appeal was pending at the time *Martinez Chavez* was decided. *See Daniels v. State*, 561 N.E.2d 487, 488 (Ind.1990).

We have subsequently modified our standard for reviewing the propriety of a death sentence where the jury has unanimously recommended against death. *See generally Peterson v. State*, 674 N.E.2d 528, 543 (Ind.1996) (Sullivan, J., concurring), *reh'g denied, cert. denied* — U.S. ——, 118 S.Ct. 858, 139 L.Ed.2d 757. This standard will be utilized in part II, *infra*, of this dissent.

3. *Cf. Kennedy v. State*, 578 N.E.2d 633 (Ind. 1991). The *Kennedy* direct appeal came to this

## II

Proceeding to the merits of Minnick's *Bivins* claim, it is clear that the trial court in determining Minnick's sentence considered aggravating circumstances not designated by our legislature as appropriate for the death sentence.[4] The sentencing court in a death penalty case must limit the aggravating circumstances eligible for consideration in death penalty cases to those specified in the death penalty statute. *Bivins*, 642 N.E.2d at 955.

As to the merits of Minnick's jury recommendation claim, we should employ the review methodology most recently articulated in *Peterson v. State:*

During appellate review of a death sentence where the jury has recommended against death, two separate and distinct issues are always presented for our consideration: (i) whether the trial court sentencing statement demonstrates due consideration of the jury recommendation; and (ii) whether this Court, upon independent reconsideration of a jury recommendation against death, nevertheless concludes that the death penalty is appropriate.

court in the same procedural posture as Minnick's. Each appellant had been sentenced to death by the respective trial court notwithstanding the respective jury's unanimous recommendations against death. *Martinez Chavez* was decided while each case was pending on direct appeal. The *Kennedy* case was remanded to the trial court for reconsideration of the sentence in light of *Martinez Chavez*. *Id.*, 578 N.E.2d at 637. As noted, the *Minnick* case was not remanded; this Court proceeded to the merits *sua sponte*. *Minnick*, 544 N.E.2d at 482.

4. The trial court's sentencing order listed the following aggravating circumstances not specified in the death penalty statute: (1) that "the decedent was in her own home where she had every right to be secure from William Minnick;" (2) that "the crime mutilated her body and defiled her even after death;" (3) that "the crime was the kind of horrendous crime that the legislature anticipated when it listed rape or robbery as aggravating circumstances and, therefore, ... that the circumstances of the crime, the violence of the attempted electrocution, the strangling and the knifing are those kinds of aggravating circumstances; and (4) the rape and after death violation of Martha Payne's body." (R. at 306.)

*Peterson,* 674 N.E.2d 528, 540 (Ind.1996) (citation and added emphasis omitted).

Here it cannot be fairly said that the trial court sentencing statement demonstrates due consideration of the jury recommendation. There is no mention of the jury recommendation in the sentencing order. (R. at 306–307.) The trial court's oral sentencing statement was prefaced by the single sentence: "The record should show then that the court, as required by statute, has considered the jury's recommendation." (R. at 370.) This single sentence was not elaborated upon and there is no further oral or written reference to the jury's recommendation or the trial court's reasons for declining to follow the jury's recommendation. *Cf. Saylor v. State,* 686 N.E.2d 80, 87 (Ind.1997) (where, "as in *Peterson,* [674 N.E.2d at 542,] the trial court gave careful and extensive consideration to the jury's recommendation and articulated reasons for not following it"), *reh'g denied, petition for cert. filed* (May 1, 1998) (No. 97–8913).

As noted *supra,* we independently consider a jury recommendation against death and determine whether the death penalty is appropriate. *Saylor,* 686 N.E.2d at 88 (citing *Peterson,* 674 N.E.2d at 540). Here the following factors lead me to the conclusion that the death penalty is not appropriate. First, there was no finding by the trial court that the murder of which Minnick was convicted was intentional.[5] Neither the trial court's oral statement at sentencing[6] nor its sentencing order[7] makes the requisite finding of intentionality. Second, there are two mitigating circumstances, each of which I would

place in the moderate range—Minnick's age at the time of the crime and his lack of significant criminal history. Minnick was 18 at the time of the crime, a factor the trial court recognized as mitigating. He did have a record of offenses committed as a juvenile (for which he had been incarcerated at the Indiana Boys' School) but none of the offenses were violent.[8] Third, as discussed, the jury recommended that the death penalty not be imposed. This is particularly significant because this is the same jury that unanimously found the defendant guilty of murder and was prepared to accept its role as the "conscience of the community" in rejecting the State's request for the death penalty. *Saylor,* 686 N.E.2d at 87 (quoting *Peterson,* 674 N.E.2d at 543).

Unlike the *Saylor* and *Peterson* cases where I joined the majority in affirming death sentences notwithstanding jury recommendations against death, here (i) the trial court improperly relied upon non-statutory aggravating circumstances, (ii) there was no finding by the trial court of the requisite intentionality necessary to support statutory aggravating circumstance relied upon, and (iii) there are two mitigating circumstances, each of medium weight. When these three considerations are juxtaposed with the unanimous rejection by the jury of the State's death penalty request, with all that such rejection imports, I cannot conclude that the death penalty is appropriate. At a minimum, I would remand for new judicial sentencing.

---

5. The statutory aggravating circumstance relied upon by the trial court and the State requires a finding that "[t]he defendant committed the murder by *intentionally* killing the victim while committing or attempting to commit ... rape, or robbery." Ind.Code § 35–50–2–9(B)(1) (1982) (emphasis added).

6. "Pursuant to Indiana Code § 35–50–2–9 I find beyond a reasonable doubt, based on the evidence presented at the trial, that William A. Minnick murdered Martha Payne while committing rape and robbery." (R. at 370–71.)

7. "Pursuant to Indiana Code § 35–50–2–9 the court finds beyond a reasonable doubt, based on the evidence presented at the trial, that William

A. Minnick murdered Martha Payne while committing rape and robbery." (R. at 306.)

8. The probation officer's testimony at sentencing suggests an adjudication of delinquency with respect to a charge of burglary and theft and additional charges that were never adjudicated on three separate occasions of (i) theft and forgery; (ii) three counts of theft; and (iii) burglary. The probation officer also testified that Minnick had once escaped from the Boys' School and once from the county jail. (R. at 344.) The probation officer testified on cross-examination that in her investigation of Minnick, she was "unable to find any matters where he had committed any type of alleged criminal offense involving any crimes of violence." (R. at 345.)